The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before the deputy commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence as a whole, the undersigned reach the same facts and conclusions as those reached by the deputy commissioner, with some minor modifications. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
Accordingly, the undersigned find as fact and conclude as matters of law the following, which were entered into by the parties prior to the initial hearing as
 STIPULATIONS
1. At the time of the injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At the time of the injury giving rise to this claim an employment relationship existed between plaintiff and defendant-employer.
3. At all relevant times defendant-employer was self-insured for workers' compensation, and Crawford and Company was the servicing agent.
4. It was stipulated that plaintiff's average weekly wage may be computed from a properly completed I.C. Form 22.
 ********** RULINGS ON EVIDENTIARY MATTERS
The objections raised by counsel at the depositions of Dr. W. R. Stafford, Jr. and Dr. Phillips J. Carter are ruled upon in accordance with the applicable provisions of the law and the Opinion and Award in this case.
 **********
Based upon all the competent credible, and convincing evidence adduced at the initial hearing, the undersigned make the following additional
 FINDINGS OF FACT
1. At the time of the initial hearing, plaintiff was a 52 year old married male who became employed with defendant-employer on March 26, 1991. Defendant-employer is in the business of transporting food supplies to various restaurants and food service institutions after gathering those food supplies at a central location. Plaintiff worked at such a facility where workers receive food stuffs, store them, and when distribution trucks arrive, load the food stuffs according to the particular order specified for each truck.
2. Plaintiff initially went to work with defendant-employer as a warehouse technician unloading french fries from railroad cars and performed this job for approximately 13 months. After that he moved to the dry loading line, where he picked up packages from the warehouse to fill orders and put those packages on a conveyor belt. After working on the dryline, in or around August 1993, plaintiff moved to the freezer/cooler area, where he was a warehouseman with duties which mainly included loading supply trucks with food stuffs.
3. Each warehouseman in the freezer/cooler area would be assigned a specific trailer to load. Plaintiff, like the other workers, would move pallets of food onto the trailer with a forklift and then stack by hand individual boxes of food until the truck had been loaded with its entire order. Workers in plaintiff's position were required to have loaded two trucks per day, but usually averaged two and one-half to three trucks per day. Trucks were loaded with boxes or "cubes" from a count of 300 to a count of 1000, with 750 cubes or more generally being a large load. A worker was supposed to load a truck in four or less hours.
4. On December 26, 1994, plaintiff was loading a truck which was slated to be loaded with approximately 900 cubes. This was the second trailer which plaintiff had loaded on that particular day. Plaintiff had finished loading the freezer portion of his truck and was starting to do the meat portion, where he was loading hamburger. Plaintiff starts loading in the nose or back portion of the trailer by stacking frozen items and continues to load "forward" to the "back" of the trailer near the door. If a load is a large load, the trailer must be packed from the floor to the ceiling. This distance is approximately nine or ten feet in height. On December 26, 1994, plaintiff was standing on the floor and lifting a box of hamburgers to go on the top of a stack of hamburgers which had already been packed. He was throwing with his right hand and using his left hand as leverage. As he threw this box, plaintiff felt a severe pain in his right forearm. Plaintiff finished his shift but complained about his arm to a co-worker and to his supervisor. Plaintiff related that he had hurt his arm and was in severe pain. Plaintiff finished the truck that he had been loading at the time of his injury and then went home.
5. At the time of his injury on December 26, 1994, plaintiff was loading a truck similar to trucks which he usually loaded and was in no greater hurry than normal. He was stacking boxes of hamburgers which are not of a type or weight different than was his usual habit. Plaintiff was stocking boxes of food as was his usual habit in his job. He was not standing on a pallet at the time of his injury as was his usual habit, but rather was standing on the floor of the truck. The undersigned do not find the fact of plaintiff standing on the floor as opposed to being atop a pallet to be significant as to make it "unusual" for plaintiff to not be atop a pallet for this particular lift/toss which resulted in his injury. Furthermore, plaintiff's job regularly involves tossing boxes with his right hand and steadying them with his left hand to place them atop a stack of boxes.
6. On December 26, 1994, while employed with defendant-employer, plaintiff performed his normal job in his usual manner without an interruption in his normal work routine.
7. Plaintiff did not sustain an injury by accident arising out of and in the course of his employment with defendant-employer.
8. On December 28, 1994, plaintiff presented to Dr. W. R. Stafford, Jr. complaining of pain in the right forearm which began after the plaintiff was lifting boxes and putting them in stacks. Plaintiff was treated with an anti-inflammatory, Lodine, an analgesic, Lorcet, given a brace, and instructed to return to the doctor in one week. On January 6, 1995, plaintiff returned to Dr. Stafford, continuing to suffer pain, primarily from tendonitis in the right elbow, and was given a steroid injection and continued on light duty. On January 10, 1995, plaintiff was continuing to experience pain and at that time was referred to Dr. Phillips J. Carter, an orthopaedic surgeon.
9. On January 10, 1995, plaintiff first presented to Dr. Phillips J. Carter with epicondylitis and injury to the radial nerve of the right arm. At that time, plaintiff was put in a forearm splint, continued on the anti-inflammatory Lodine and given light duty. Plaintiff continued to have pain, and on January 18, 1995 was given an injection of cortisone, kept out of work for forty-eight hours and returned to light duty.
10. Throughout February, March, and April, plaintiff continued conservative treatment with Dr. Carter. Ultimately it was determined that plaintiff required a right radial release and right carpal tunnel release (of which the carpal tunnel release was not related to plaintiff's December 26, 1994 injury). Plaintiff underwent the right radial and right carpal tunnel release performed by Dr. Carter on May 3, 1995. Subsequent to the surgery plaintiff developed a hematoma which delayed his recovery.
11. Plaintiff underwent a course of physical therapy following his surgery and the resolution of his hematoma and was ultimately released to return to work full duty on July 8, 1996.
12. On July 8, 1996, plaintiff reached maximum medical improvement and sustained a ten percent permanent partial disability of his right arm as a result of his December 26, 1994 injury.
13. On several occasions during the course of plaintiff's treatment for his right arm pain, plaintiff was released to return to work to light duty and sought to return to light duty with defendant-employer, but he was informed that there was no light duty available for him and that he would not be allowed to return to work for defendant-employer until he was able to return to full duty at his regular job.
14. Plaintiff's lateral epicondylitis and radial nerve problems were caused by wear and tear from repeated use of his right arm, but were materially aggravated at the time of the lifting incident on December 26, 1994, when he threw the box of hamburger with his right arm steadying it with his left.
15. Plaintiff was out of work from December 27, 1994 until July 8, 1996 as a direct result of the lifting incident while he was performing his regular work duties in the normal fashion on December 26, 1994.
16. In the process of tossing a box atop a stack of boxes with his right hand while balancing the box with his left hand on December 26, 1994, plaintiff experienced an acute onset of pain in his right forearm resulting in epicondylitis and right radial neuropathy and arm pain; however, plaintiff's injury was not a result of an interruption of his work routine or the introduction of unusual conditions as he was carrying on his usual and customary daily duties in the usual way at the time of the injury.
17. Although plaintiff sustained an injury arising out of and in the course of his employment on December 26, 1994, his injury was not the result of an accident.
18. At the time of his injury, plaintiff was earning an average weekly wage of $489.30.
 **********
The foregoing findings of fact and conclusions of law engender the following additional
 CONCLUSIONS OF LAW
1. On December 26, 1994, plaintiff did not sustain an injury by accident. G.S. § 97-2(6).
2. On December 26, 1994, plaintiff sustained an injury arising out of and in the course of his employment; however, the same injury was not the result of an accident as contemplated by the North Carolina Workers' Compensation Act. Absent an "accident" the North Carolina Workers' Compensation Act does not provide compensation for the injury. In order to have a compensable "accident" in cases not involving back injuries or hernias, there must be an interruption of the normal routine and the introduction thereby of unusual conditions likely to result in unexpected consequences. Garmon v. TridairIndustries, 14 N.C. App. 574 (1972). "Injury" and "accident" do not mean the same thing and an injury does not occur by accident if the employee at the time, as he was in the instant case, was merely carrying out his usual and customary duties in the usual way. Russell v. Yarns, 18 N.C. App. 249
(1973).
3. Plaintiff is, therefore, entitled to no compensation under the provisions of the North Carolina Workers' Compensation Act. G.S. § 97-2 et seq.
 **********
The foregoing findings of fact and conclusions of law engender the following
 ORDER
1. Under the law, plaintiff's claim must be, and the same is therefore, DENIED.
2. Each party shall bear its own costs, except that defendants are ORDERED to pay an expert witness fee of $175.00 to Dr. W. R. Stafford, Jr., in connection with his deposition which was taken in this matter on October 16, 1996 and a fee of $235.00 to Dr. Phillips J. Carter in connection with his deposition taken in this matter on October 16, 1996.
This case is ORDERED REMOVED from the Full Commission hearing docket.
This the ____________day of ______________, 1998.
 S/ ________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/. ____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/. ____________________ RENÉE C. RIGGSBEE COMMISSIONER
JHB/kws